# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

| | | |
|---|---|---|
| TANYA and GARY CONLAY, on behalf of themselves and on behalf of all others similarly situated, | ) ) ) ) | No. 2:14-mn-00001-DCN |
| | ) | No. 2:14-cv-00539-DCN |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| PELLA CORPORATION, | ) ) | **ORDER** |
| Defendant. | ) ) ) | |

This matter is before the court on defendant Pella Corporation's ("Pella") motion for summary judgment. For the reasons set forth below, the court denies Pella's motion for summary judgment.

## I.  BACKGROUND

Pella is an Iowa Corporation with its principal place of business in Pella, Iowa. Def.'s Mot. 2. Pella manufactures windows that are sold through distributors and retailers. Id. Plaintiffs Tanya and Gary Conlay ("the Conlays") are Louisiana homeowners who purchased Pella windows in conjunction with the construction of their home in April 2000. Def.'s Mot. Ex. A, Answers to Interrog. 4. "Plaintiffs first noticed window damage in certain windows some time in 2007 at which time [p]laintiff contacted Pella about replacing those windows when damage to those particular windows could be observed." Id. Some of the windows in the Conlays' home were replaced in 2008. Id. Additional windows were replaced in November 2012. Mr. Conlay Depo. 40:7–10.

1

The Conlays filed the present action in the Eastern District of Louisiana on February 24, 2013 asserting diversity jurisdiction.[1] On May 22, 2013, plaintiffs filed an amended complaint, alleging the following eleven causes of action: (1) strict liability, (2) negligence, (3) breach of express warranty, (4) breach of implied warranties, (5) negligent misrepresentation, (6) fraud, (7) breach of express warranty, (8) design defect, (9) construction or composite defect, (10) redhibition, and (11) declaratory relief. Prior to transfer to this court, plaintiffs voluntarily dismissed their national class claims for strict liability, negligence, express warranty, implied warranty, negligent misrepresentation, and fraud pursuant to Rule 41(a)(1)(A). ECF No. 30. The Eastern District of Louisiana subsequently dismissed plaintiffs' state law claim for breach of express warranty. ECF No. 37. The United States Judicial Panel on Multidistrict Litigation transferred the plaintiffs' case to this court on February 27, 2014.

On November 18, 2014, plaintiffs' counsel sent Pella an email stating "[p]laintiffs will dismiss the class claims in the *Andrews/Conlay* Complaint and allow Mr. Conlay to proceed individually; and proceed with the *Palacios* matter for class claims in Louisiana." Def.'s Mot. to Dismiss, Ex. A. On December 16, 2014, Pella filed a motion to dismiss the remaining class action claims, attaching a proposed consent motion to dismiss in accordance with the email above. On October 27, 2015, the court granted Pella's motion to dismiss the Conlays' class claims with prejudice. The court also granted the Conlays' motion to file a second amended complaint; however, the court

---

[1] Christy and Greg Andrews were originally named plaintiffs in this action. However, the court granted the Andrews' voluntary motion to dismiss without prejudice on January 13, 2015. Therefore, the Conlays are the only remaining plaintiffs in this action.

ruled that the Conlays could not include a breach of express warranty claim in light of Judge Berrigan's ruling in the Easten District of Louisiana prior to transfer. Therefore, the Conlays only remaining claims are individual state law claims for design defect and construction defect under the Louisiana Products Liability Act, redhibition, and declaratory relief.

On September 16, 2015, Pella filed the present motion for summary judgment. The Conlays responded on October 5, 2015, and Pella replied on October 16, 2015. The motion has been fully briefed and is now ripe for the court's review.

## II.   STANDARD

Summary judgment shall be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a

genuine issue for trial." Id. at 249. When the party moving for summary judgment does not bear the ultimate burden of persuasion at trial, it may discharge its burden by demonstrating to the court that there is an absence of evidence to support the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The non-movant must then "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322. The court should view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor. Anderson, 477 U.S. at 255.

This case is predicated on diversity jurisdiction and was filed in federal court, so it is governed by state substantive law and federal procedural law. Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co., 559 U.S. 393, 416 (2010) (citing Hanna v. Plumer, 380 U.S. 460, 465 (1965)). "In multidistrict litigation, the law of the transferee circuit governs questions of federal law." In re KBR, Inc., 736 F. Supp. 2d 954, 957 (D. Md. 2010) modified on reh'g sub nom. In re KBR, Inc., Burn Pit Litig., 925 F. Supp. 2d 752 (D. Md. 2013) vacated and remanded on other grounds, 744 F.3d 326 (4th Cir. 2014); see also In re Gen. Am. Life Ins. Co. Sales Practices Litig., 391 F.3d 907, 911 (8th Cir. 2004); Menowitz v. Brown, 991 F.2d 36, 40 (2d Cir. 1993); In re Korean Air Lines Disaster of Sept. 1, 1983, 829 F.2d 1171, 1176 (D.C. Cir. 1987); cf. Bradley v. United States, 161 F.3d 777, 782 n.4 (4th Cir. 1998) (applying Fourth Circuit law to questions of federal law in a case transferred from the Fifth Circuit). Therefore, this court must apply Louisiana substantive law and Fourth Circuit procedural law.

### III.   DISCUSSION

Pella argues that the Conlays' claims must be dismissed because they are barred by the applicable statute of limitations. The parties dispute when the Conlays discovered the defect in the windows to start the prescriptive period.

The Conlays' claims under the Louisiana Products Liability Act ("LPLA")[2] are subject to a one-year prescriptive period. Am. Zurich Ins. Co. v. Caterpillar, Inc., 2012-270, p. 2 (La. App. 3 Cir. 10/3/12); 99 So. 3d 739, 741 (citing La. Civ. Code Ann. art. 3492). Louisiana Civil Code Article 3492 provides that "[d]elictual actions are subject to a liberative prescription of one year" which "commences to run from the day injury or damage is sustained." La.Civ.Code art. 3492. "The prevailing wisdom is that prescription begins to run when the defect manifests itself, not on the date the underlying cause of the defect is found." Am. Zurich, 2012-270, p. 3; 99 So. 3d at 741. "Prescription commences and continues when a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that he or she is the victim of a tort." Knippers v. Lambard, 620 So. 2d 1368, 1371 (La. Ct. App. 1993) (citing Percy v. State, E.A. Conway Mem'l Hosp., 478 So. 2d 570 (La. App. 2d Cir. 1985)). However, the Supreme Court of Louisiana has applied the jurisprudential doctrine of contra non

---

[2]   The LPLA "establishes the exclusive theories of liability for manufacturers for damages caused by their products." La. Rev. Stat. Ann. § 9:2800.52; Jefferson v. Lead Indus. Ass'n, Inc., 106 F.3d 1245, 1250 (5th Cir. 1997). "A plaintiff may not recover from a manufacturer for damage caused by a product on the basis of any theory of liability not set forth in the LPLA." Jefferson, 106 F.3d at 1250–51 (citing La. Rev. Stat. Ann. § 9:2800.52). "Courts have consistently held the LPLA subsumes all possible causes of action, with the exception of a claim in redhibition." Touro Infirmary v. Sizeler Architects, 2004-2210, p. 2 (La. App. 4 Cir. 11/21/06); 947 So. 2d 740, 744. Therefore, the Conlays' design defect and construction or composition defect claims are all governed by the LPLA.

valentem as an exception to the statutory one-year prescriptive period. See Marin v. Exxon Mobil Corp., 2009-2368 (La. 10/19/10), 48 So. 3d 234, 245.

The Conlays contend that the discovery rule, a sub-category of the doctrine of contra non valentem, applies under these circumstances. Pls.' Resp. 3.

> The doctrine of contra non valentem provides that prescription does not run against one who is ignorant of the facts upon which their cause of action is based and applies an exception to the statutory prescriptive period where in fact and for good cause a plaintiff is unable to exercise his cause of action when it accrues.

Eastin v. Entergy Corp., 2003-1030, p. 6 (La. 2/6/04), 865 So. 2d 49, 55 (citations omitted) (emphasis in original); see also Marin, 48 So. 3d at 245 ("where the cause of action is neither known nor reasonably knowable by the plaintiff even though plaintiff's ignorance is not induced by the defendant," the doctrine prevents the running of liberative prescription). The discovery rule applies in cases involving property damage. Id.

Under the discovery rule, "prescription commences on the date the injured party discovers or should have discovered the facts upon which his cause of action is based." Eastin, 865 So. 2d at 56. "When a plaintiff acts reasonably to discover the cause of a problem, 'the prescriptive period [does] not begin to run until [he has] a reasonable basis to pursue a claim against a specific defendant.'" Chevron USA, Inc. v. Aker Mar., Inc., 604 F.3d 888, 894 (5th Cir. 2010) (quoting Jordan v. Emp. Transfer Corp., 509 So. 2d 420, 424 (La. 1987)). "This standard is exceedingly stringent and should be applied only in exceptional circumstances." Id. "Louisiana jurisprudence recognizes that contra non valentem is an exceptional remedy which is in direct contradiction to the articles in the Civil Code and therefore should be strictly construed." Bergeron v. Pan Am. Assur. Co., 98-2421 (La. App. 4 Cir. 4/7/99), 731 So. 2d 1037, 1042 (citing Harsh v. Calogero, 615

So. 2d 420, 422 (La. App. 4 Cir. 1993)).  "The jurisprudence is clear that this 'discovery' does not require certain knowledge but merely sufficient information to incite curiosity as to the cause of the discomfort."  Knippers, 620 So. 2d at 1371 (citing Speights v. Caldwell Mem'l Hosp., 463 So. 2d 881 (La. App. 2d Cir. 1985)).  "As for the commencement of prescription, the reasonableness of the plaintiff's action or inaction is the fundamental precept the Court must focus on in determining when prescription commences." Tiger Bend, LLC v. Temple-Inland, Inc., 56 F. Supp. 2d 686, 692 (M.D. La. 1999).  "Often, it is difficult to identify the precise time at which the claimant becomes aware of sufficient facts to begin the running of prescription."  Labbe Serv. Garage Inc. v. LBM Distributors, Inc., 650 So. 2d 824, 830 (La. App. Ct. 1995).

On October 12, 2011, Mr. Conlay sent Joel Braud an email in which he states the following:

> I am waiting to hear from the Pella guy . . . and the MetLife Insurance adjuster . . . . The windows in the worst shape are in the turret, closest to the pool side door, and the one in Allie's upstairs bedroom facing Sibley Lake.  (There are other windows that have rotted, but the damage seems to be limited to the windows in those areas.)  Inside Allie's closet, the paint came away from the wall around the turret, but no further damage developed.  This has existed for several years.  Common sense tells me there must be a leak in that area, maybe where the turret meets the house.  <u>The adjuster is to have a roofer take a look at the shingles and determine if wind was the culpret</u> [sic].

Def.'s Mot. Ex. C (emphasis added).  In a second email to Joel Braud on January 19, 2012, Mr. Conlay sends the quote Pella provided to replace the windows its representative identified as needing replacement.  Def.'s Mot. Ex. D.  Mr. Conlay stated: "I'm not sure we need that many windows replaced, especially since Pella doesn't accept any responsibility for the rotting."  Id.  Mr. Conlay also stated:

> I know the window between the turret and the back door by the pool needs replacing, as well as one in Allie's room, that is completely rotten, and a few more. Two doors on the back side of the house may also need replacing. The roof around the turret appears to have a leak, which may have resulted in the damaged window there. The insurance adjuster told me he needed to get someone on the roof, but no one came.

Id.

During his deposition, Mr. Conlay testified that "[t]his may have been around the time we began to be concerned about the windows leaking or needing to be replaced or there being some problem with them[,]" referring to a service ticket from January 19, 2005. Pl.'s Resp. Ex. 2, G. Conlay Depo. 28:23–29:8. Mr. Conlay further testified that Mike Williams, an employee of KC South, Inc. whom he contacted to replace the windows in 2005, told him that "the wind coming off Sibley Lake may have caused the windows to rot prematurely." Pl.'s Resp. Ex. 2, G. Conlay Depo. 36:15–21. Mr. Conlay testified that "Mike advised me that that was caused by water rolling off of this roof, hitting the turret, and getting behind these stones and filtering down. And that was causing all this rotting. That theory was later supported by Mr. Dirk Foster who my homeowner's insurance sent to inspect . . . ." Id. at 43:20–23. Ms. Conlay testified that in 2007 and 2008, she noticed problems with windows other than those replaced in 2008. She testified that she wanted them replaced "[b]ecause [she] could tell they were going to do the same thing that the other windows did." Def.'s Mot. Ex. 6, T. Conlay Depo. 29:15–30:4.

Citing the aforementioned correspondence and testimony, the Conlays argue that they did not become aware that the damage was due to a defect in the windows until the windows were physically removed in November 2012. Pls.' Resp. 2. The Conlays rely on Jordan v. Emp. Transfer Corp., 509 So. 2d 420 (La. 1987), to argue that they did not

have a reasonable basis to conclude that they had a claim against Pella to start the prescriptive period until the windows were removed from their home in November 2012. In Jordan, the plaintiffs noticed water in the den of their home on October 1, 1982. Id. at 421. The plaintiffs hired someone to clean the den, and the cleaner suggested that the water in the den could have been caused by either flashing on the roof around the chimney, cracks in the foundation, or a broken pipe. Id. at 422. After inspecting the house, an insurance adjuster concluded that the water had probably come in from a leaking flashing where the chimney met the roof and agreed to pay for the damage. Id. On December 1, 1982, the den flooded a second time and the plaintiffs could see water seeping through the foundation. Id. At that point, they obtained a previously-completed engineering report which indicated that the foundation was structurally damaged. Id. The plaintiffs filed suit in redhibition on December 1, 1983, seeking to rescind the sale and obtain damages. Id.

The Louisiana Supreme Court held that when the plaintiffs first discovered water in the den, "[t]hey reasonably suspected that the water had entered between the flashing and the chimney." Id. The court found that the plaintiffs reasonably relied on the seller's representations and a civil engineer's report that the foundation was not unsound. Id. The court noted that the plaintiffs did not discover the origin of the leak until the second time the den flooded. Id. Therefore, the court determined that the plaintiffs' suit was timely because it was not until December 1, 1982 that the plaintiffs had a "reasonable basis to pursue a claim against a specific defendant" when they discovered that the seller's assurances and the engineer's report were incorrect. Id. at 424. In doing so, the Louisiana Supreme Court distinguished another case in which the Louisiana Court of

9

Appeal determined that a plaintiff who noticed water seeping into his den more than a year before filing suit could not bring suit, noting that "[t]here was no question about the source of the water." Id. at 422–23 (citing Lee v. Equitable Life Assur. Soc. of U. S., 391 So. 2d 37, 39 (La. Ct. App. 1980)).

Pella argues that the Conlays cannot rely on the discovery rule because they had actual knowledge of the defect more than one year prior to filing suit against Pella in February 2013. Def.'s Mot. 10. Pella cites Tiger Bend, LLC v. Temple-Inland, Inc., 56 F. Supp. 2d 686, 692 (M.D. La. 1999), to support its argument. In Tiger Bend, the plaintiff invoked the doctrine of contra non valentum, arguing that the prescriptive period did not commence until the plaintiff learned of a class-action lawsuit involving the alleged defective nature of the defendant's siding material. Id. at 692. The court held that because "much of the siding had deteriorated over the years and have been replaced[,]" the plaintiff had sufficient knowledge to start the prescriptive period more than one year prior to filing suit. Id. at 693. The court held that "[p]rescription runs from the discovery of the defect, not the cause of the defect" and that "when prescription begins to run depends on the reasonableness of a plaintiff's action or inaction." Id. Analyzing the reasonableness of the plaintiff's actions, the court noted that the plaintiff knew the product was damaged for years "but never inquired as to why a product expected to last for over 100 years was deteriorating." Id. Therefore, the court held that the plaintiff had a "reasonable basis to pursue a claim" against the defendant more than one year prior to filing suit. Id.

The court finds Gad v. Granberry, a 2007 case from the Court of Appeal of Louisiana, instructive. Gad v. Granberry, 2007-117 (La. App. 3 Cir. 5/30/07), 958 So. 2d

10

125. In Gad, the plaintiffs purchased a home with water infiltration issues. Id. 958 So. 2d at 126. Prior to sale, the plaintiffs had the home inspected. Id. The inspector noticed minor drywall cracking and water penetration resulting in window problems that he attributed to "construction techniques in the dormers." Id. The inspector recommended the plaintiffs perform some minor repairs, including drywall refinishing and window repairs. Id. A second inspector noted water damage due to roof runoff and recommended correcting the water damage. Id. Shortly after the sale, the plaintiffs hired a construction company to make the recommended repairs. Id. The plaintiffs also had inspectors investigate the deterioration of the wooden window frames. Id. The inspector noted excessive moisture levels and attributed the excessive moisture to inadequate or missing sealants. Id. Upon removing some of the drywall, the inspector found water stains, damage, and mold. Id. at 126–27. The plaintiffs then hired an architect who discovered problems with the installation of the exterior walls that allowed water to get trapped behind the home's exterior walls. Id. at 127.

The trial court granted the defendant's motion for summary judgment, finding that the plaintiffs' claims were barred by the statute of limitations. The Court of Appeal of Louisiana reversed. Id. at 131. The court found that the architect, hired within one year before the plaintiffs filed suit, was "the first expert to suggest such a system-wide problem to the [plaintiffs], and it was his removal of the [exterior] walls that exposed the true extent of the damage." Id. at 130. The court held that although the plaintiffs "investigated the problems with their home and made the recommended repairs, . . . they were not informed of either the origin of the problems or the extent of the damage until consultation with [the architect]." Id. Therefore, reviewing the totality of the record

11

before it, the court found "that the trial court erred in granting Defendants' exceptions of prescription." Id. at 131. Like the plaintiffs in Gad, there is evidence on the record that the Conlays may not have discovered the cause and extent of the rotting until after the windows were removed. Although the Conlays knew that the windows were rotting, as of January 19, 2012, there is a genuine dispute of material fact as to whether the Conlays attributed the rotting to a defect in the windows. There is no undisputed evidence that the Conlays acquired such knowledge until the windows were removed in November 2012.

Further, in Jordan, the court found that it was reasonable for the homeowner plaintiffs to rely on the representations of the seller, an insurance adjuster, and the cleaner that the damage was not due to an unsound foundation. Jordan, 509 So. 2d at 422. The plaintiffs in Jordan were fully aware that the floor was leaking, but they were unsure of why it was leaking. Id. at 422–24. Similarly, although the Conlays were completely aware that the windows were rotting, they did not clearly attribute the rotting to defective windows. There is evidence in the record that the Conlays believed the rotting could have been caused by a leak in the roof or wind coming off of the lake. Mike Williams and Dirk Foster both represented that the problem may be caused by a leak in the roof. As of October 12, 2011, Mr. Conlay sent an email to his insurance adjuster in which he expressed his uncertainty as to the culprit. Further, in a second email on January 19, 2012, Mr. Conlay stated: "The roof around the turret appears to have a leak, which may have resulted in the damaged window there. The insurance adjuster told me he needed to get someone on the roof, but no one came." Def.'s Mot. Ex. D. Although it is undisputed that the Conlays knew that their windows were rotting, there is genuine issue of material fact as to when they had a reasonable basis to pursue a claim because there is

12

evidence that the Conlays believed that the rotting could have been caused by other sources rather than defective windows.  "Prescription should not be used to force a potential plaintiff who believes that he may have a cause of action to rush to the courthouse to file suit against all parties that may have caused the damage." Labbe Serv. Garage Inc. v. LBM Distributors, Inc., 650 So.2d 824, 829 (La. App. Ct. 1995) (citing Miley v. Consolidated Gravity Drainage District No. 1, 93-1321 (La.App. 1st Cir. 9/12/94); 642 So.2d 693) (emphasis added).

Further, "summary judgment is seldom appropriate for determinations based on subjective facts such as knowledge." Id. at 830.  "Clearly, [the Conlays'] level of knowledge is a material fact—one whose existence or nonexistence may be essential to [their] cause of action under the applicable theory of recovery." Id. (citing Penalber v. Blount, 550 So. 2d 577, 583 (La. 1989)).  The Conlays subjective knowledge is clearly in dispute as of January 19, 2012.  Although the Conlays did not file suit until February 24, 2013, more than a year later, there is no undisputed evidence after the January email that establishes that the Conlays attributed the rotting in the windows to an alleged defect rather than the other possible causes until they were removed in November 2012.  To make such a determination would be to improperly weigh the evidence at this stage of the litigation.

Therefore, the court holds that there is a genuine dispute of material fact as to whether the Conlays had sufficient knowledge to start the running of the prescriptive period.

## IV.  CONCLUSION

For the reasons set forth above, Pella's motion for summary judgment is **DENIED**.

**AND IT IS SO ORDERED**.

 

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**February 18, 2016**
**Charleston, South Carolina**